# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **TREADS USA, LLC, et al.,** | ) | |
| Plaintiffs, | ) | Civil Action No.: 1:08cv00027 |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| **BOYD LP I, et al.,** | ) | |
| Defendants. | ) | BY: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

This matter is currently before the court on defendant Clinch Mountain Finishing & Logistics Corp.'s Motion For Judgment On The Pleadings, (Docket Item No. 135), ("Motion"), which was filed on October 19, 2009. On November 16, 2009, the plaintiffs filed Plaintiffs' Memorandum in Opposition to Clinch Mountain Finishing & Logistics Corp.'s Motion for Judgment on the Pleading, (Docket Item No. 150), ("Brief in Opposition"), and on November 23, 2009, the defendant filed its Reply Memorandum In Support Of Motion For Judgment On The Pleadings, (Docket Item No. 163), ("Reply Brief"). The Motion was argued before the undersigned on December 22, 2009; thus, it is now ripe for decision. The Motion is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, I now submit the following report and recommended disposition.

## I. Facts

This case arises out of business transactions among certain parties, which, in

turn, allegedly damaged the plaintiffs. The factual allegations set forth are fairly complex, in that they involve several individuals and entities. In order to have better understanding of the alleged events, a brief explanation of the relevant parties is necessary. The plaintiffs in this case are Treads USA, LLC, ("Treads"), VFI Associates, LLC, ("VFI"), Burke LP I and Nicewonder LP I. Treads is a Virginia limited liability company that was organized to make pre-finished high-end wooden staircases and is owned by Boyd LP I, Bundy LP I, Burke LP I and Nicewonder LP I. At the time of the events relevant to this case, Treads was managed by Boyd LP I. VFI is also a Virginia limited liability company that was managed by Boyd LP I. VFI was organized to buy hardwood flooring and apply coatings to the wood flooring products. Nicewonder LP I had a 30 percent ownership interest in VFI, while Boyd LP I owned 22.5 percent, and Burke LP I owned 15 percent, with the remaining ownership split almost equally among Bundy LP I, KWA-Hart Family, LLC and Lawson LP I. Burke LP I is a Virginia limited partnership whose general partner is Michael Burke, and Nicewonder LP I is also a Virginia limited partnership whose general partner is Donald Nicewonder. Burke and Nicewonder invested significant sums of money into VFI and Treads, as well as their respective limited partnerships.

The defendants in this case are Boyd LP I, Luther Boyd,[1] Teresa Colston-Boyd, Clinch Mountain Hardwood Flooring, Inc., ("CMHF"), Clinch Mountain Finishing & Logistics Corp., ("CMFL"), Salvage Hardwood Flooring, ("SHF"), Creative Wood

---

[1] By Order dated February 16, 2010, (Docket Item No. 195), the undersigned ordered that all actions in this case brought by or against Luther Boyd were stayed pending further order of the court. Thus, while the Report and Recommendation will discuss the actions of Luther Boyd, no formal decision or recommendation will be made with respect to him.

Works, Inc., ("CWW"), and Jessee Boyd.[2] Boyd LP I is a Virginia limited partnership owned by Luther Boyd and Teresa Colston-Boyd, who serve as the entity's general partners, and Jessee Boyd, Luther's son, who serves as a limited partner. CMHF is believed to be owned by Luther Boyd and Teresa Colston-Boyd. Brian Fuller is an employee of CMFL, whose services were allegedly leased to CMHF, where, after his services were leased, he performed work primarily at the direction of Teresa Colston-Boyd. CMFL is a Virginia corporation that was formed on September 20, 2005, to apply finish to hardwood flooring. Luther Boyd is allegedly the president, director and registered agent of CMFL, and he allegedly owns 50 percent of the corporation's stock. CWW is allegedly owned in whole or part by Teresa Colston-Boyd, who serves as the director and registered agent. Jessee Boyd, CWW's president, also is believed to possess an ownership interest in CWW. SHF, which is not registered with the Virginia State Corporation Commission, is believed to be owned by CMHF and/or Teresa Colston-Boyd.

According to the plaintiffs, as early as September 2005, Luther Boyd and Teresa Colston-Boyd, through their limited partnership Boyd LP I, became the managers and procuring agents for VFI and entered into an agreement with Robin Yuan and two California corporations that he owned. VFI allegedly was encouraged to purchase equipment from one of Yuan's corporations at grossly inflated prices and, in return, Yuan or one of his corporations would pay kickbacks to an entity or entities owned by either, or both, Luther Boyd or Teresa Colston-Boyd or to corporations owned by one of their family members. The plaintiffs contend that the Boyds

---

[2]Pursuant to a joint motion for voluntary dismissal, by Order dated February 16, 2010, (Docket Item No. 198), Brian Fuller was dismissed as a party from this action without prejudice.

deliberately concealed the kickback payments from VFI and its members.

The plaintiffs further allege that, as early as September 2006, the Boyds, through Boyd LP I, became the managers and procuring agents for VFI and Treads, and Luther Boyd, as president of CMFL, entered into an agreement with a North Carolina company named Akzo Nobel Coatings, Inc., ("Akzo"). The plaintiffs claim that the agreement called for VFI and Treads to purchase coatings and other supplies from Akzo at substantially inflated prices, which were to be followed by kickback payments made to at least one entity owned by Teresa Colston-Boyd, Luther Boyd, or both. The kickback payments were allegedly deliberately concealed from CMFL's other shareholders and from VFI and Treads and some of their members. The plaintiffs claim interstate United States mail communications and interstate wire communications were used to carry out the alleged commercial bribery scheme.

## II. Analysis

When deciding a Rule 12(c) motion for judgment on the pleadings, the court must apply the same standard that is applied when ruling on a motion to dismiss pursuant to Rule 12(b)(6). *See Burbach Broad. Co. v. Elkins Radio Corp.*, 278 F.3d 401, 405-06 (4th Cir. 2002); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). In considering a motion to dismiss under Rule 12(b)(6) or Rule 12(c),[3] the

---

[3]The court recognizes that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." FED. R. CIV. P. 12(d). In this case, the plaintiffs did submit supplementary information at the time of the hearing; however, the information outside of the pleadings was not considered for purposes of this motion. Thus, the Rule 12(c) motion shall be appropriately treated as a Rule 12(b)(6) motion.

court must assume that the allegations in the non-moving party's pleadings are true and construe all facts in the light most favorable to the nonmoving party. *See Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). "Judgment should be entered when the pleadings, construing the facts in the light most favorable to the non-moving party," indicate that the dispute "can . . . be decided as a matter of law." *O'Ryan v. Dehler Mfg. Co.*, *Inc.,* 99 F. Supp. 2d 714, 718 (E.D. Va. 2000); *see also A.S. Abell Co. v. Baltimore Typographical Union No. 12*, 338 F.2d 190, 192 (4th Cir. 1964) (the court discussed whether "it was proper to enter judgment as a matter of law" under Rule 12(c)).

Since the Rule 12(c) motion must be considered just as a Rule 12(b)(6) motion, the court notes that, for quite some time, this court has cited *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), for the proposition that in order to grant a motion to dismiss, it must appear certain that the plaintiff cannot prove any set of facts in support of their claim entitling them to relief. *See also Edwards*, 178 F.3d at 243-44. However, the Supreme Court recently revisited the proper standard of review for a motion to dismiss and stated that the "no set of facts" language from *Conley* has "earned its retirement" and "is best forgotten" because it is an "incomplete, negative gloss on an accepted pleading standard." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007).

In *Twombly*, the Supreme Court stated that "a plaintiff's obligation to provide the 'grounds' of [his] 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). The "[f]actual allegations must be enough to raise a right to relief above the speculative

level." *Twombly*, 550 U.S. at 555 (citations omitted). Additionally, the Court established a "plausibility standard" in which the pleadings must allege enough to make it clear that relief is not merely conceivable but plausible. *See Twombly*, 550 U.S. at 555-63.

The Court further explained the *Twombly* standard in *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949-50 (2009):

> Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. ... Second, only a complaint that states a plausible claim for relief survives a motion to dismiss . . . .
>
> In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief.

(Internal citations omitted.)

In the Motion, the arguments mainly pertain to named defendant CMFL. However, as set forth in the brief, there are certain arguments that would apply to all named defendants if the court were to agree with the defendant CMFL's contentions.

*A. Racketeering Claims*

In this case, the plaintiffs' first two claims deal specifically with the Racketeer Influenced and Corrupt Organizations Act, ("RICO Act"), 18 U.S.C. § 1961 *et seq.* In Count One of the Amended Complaint, the plaintiffs claim that the relevant parties all were "persons" as defined in 18 U.S.C. §§ 1961(3) and 1964(c). (Docket Item No. 63, ("Amended Complaint"), at 88-89.) Furthermore, the plaintiffs allege that, at all relevant times, Boyd LP I, and its general partners, Luther Boyd and Teresa Colston-Boyd, controlled VFI and Treads, which both were managed by Boyd LP I. (Amended Complaint at 89.) The plaintiffs also allege that VFI and Treads were engaged in activities of interstate commerce and that Boyd LP I and its general partners "controlled the enterprises and conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a 'pattern of racketeering activity' within the meaning of the RICO, 18 U.S.C. § 1961(5), in violation of RICO, 18 U.S.C. § 1962(c)." (Amended Complaint at 89.) The plaintiffs claim that the defendants and the other conspirators engaged in racketeering activity by violating the following statutes:

> Mail Fraud 18 U.S.C. § 1341[,] Wire or Radio Fraud 18 U.S.C. § 1343, Interstate Travel Act 18 U.S.C. [§] 1952, Money Laundering 18 U.S.C. § 1956, Obstruction of Justice (concealing documents from an official proceeding) under U.S.C. § 1512(c), Interstate Travel Act 18 U.S.C. § 1952 (Commercial Bribery Va. Code [§] 18.2-444), Trademark infringement 15 U.S.C. § 1114 *et* [] *seq.*, [] Copyright infringement 17 U.S.C. § 501 [and] Bank Fraud 18 U.S.C. § 1344[. The plaintiffs assert that the] Defendants and their aiders and abettors each committed and/or aided and abetted the commission of two or more of these acts of racketeering activity.

(Amended Complaint at 89-90.)  According to the plaintiffs, these actions constituted a pattern of racketeering. The plaintiffs also allege that the acts were related to one another because they involved common participants, common victims, a common method of commission and the common purpose and result of defrauding the plaintiffs of nearly $6 million, which enriched the defendants and co-conspirators, while the defendants concealed their fraudulent activities.  (Amended Complaint at 90.)  The plaintiffs allege that the fraudulent scheme has continued for more than two years and that the cover-up of the scheme continued until the time of filing the Amended Complaint.  (Amended Complaint at 90.)  The plaintiffs claim that the fraudulent misstatements of the defendants, upon which the plaintiffs relied to their detriment, and the defendants' misconduct, caused the plaintiffs to be "directly and proximately injured in their business or property by the predicate acts engaged in by the [d]efendants and their aiders and abettors."  (Amended Complaint at 90-91.)  The plaintiffs specifically allege that "Boyd LP I, and its general partners[,] Luther Boyd and Teresa Colston-Boyd, conducted and controlled at least two enterprises that engaged in or affected interstate commerce" and that through a pattern of racketeering activities, the defendants injured each of the plaintiffs in its business or property. (Amended Complaint at 91.)

Pursuant to the RICO Act, a private civil remedy is available to plaintiffs who have been injured due to violations of the Act's substantive provisions.[4]  *See* 18

---

[4]  In relevant part, 18 U.S.C. § 1964(c) states that "[a]ny person injured in his business or property by reason of a violation of section 1962 . . . may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee[.]"

U.S.C.A. § 1964(c) (West 2000). In Count One, the plaintiffs specifically seek recovery under 18 U.S.C.A. § 1962(c), which provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C.A. § 1962(c) (West 2000).

In order to properly state a claim under this section, the plaintiffs must establish (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *See Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). Under the RICO Act, racketeering activity is defined as an act that is indictable under a list of criminal offenses, including offenses such as bribery, mail fraud and wire fraud. *See* 18 U.S.C.A. § 1961(1) (West 2000 & Supp. 2009). Furthermore, a pattern of racketeering activity is defined as two predicate acts of racketeering activity within 10 years. *See* 18 U.S.C.A. § 1961(5) (West 2000). The United States Supreme Court has explained that the meaning of § 1962(c) "comes into focus" once we understand the meaning of the words "conduct" and "participate." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). The Court stated that "'conduct' . . . require[s] some degree of direction and the word 'participate' . . . require[s] some part in that direction[.]" *Reves*, 507 U.S. at 179. The Court further explained that participating, directly or indirectly, in the conduct of the enterprise's affairs means that the person or entity "must have some part in directing those affairs." *Reves*, 507 U.S. at 179.

Keeping the above principles and requirements in mind, in order to recover in a civil RICO Act case, a plaintiff must show that "(1) the defendant violated § 1962;

(2) it has suffered injury to its business or property; and (3) the defendant's violation of the RICO statute was the proximate cause of such injury." *Buchanan County v. Blankenship*, 496 F. Supp. 2d 715, 718 (W.D. Va. 2007) (citing *Brandenburg v. Seidel*, 859 F.2d 1179, 1186 (4th Cir. 1988), overruled on other grounds by *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 711 (1996)). "Causation principles applicable to tort liability are applicable in civil RICO cases." *Buchanan County*, 496 F. Supp. 2d at 718 (citing *Brandenburg*, 859 F.2d at 1189). Therefore, a plaintiff is required to show that its injury was a legal or proximate cause of the defendants' violation of the RICO Act, *see Miller v. Asensio & Co.*, 364 F.3d 223, 232 n.6 (4th Cir. 2004), but simply a cause-in-fact connection alone will not establish liability. *See Brandenburg*, 859 F.2d at 1189.

Although the plaintiffs' prayer for relief for Count One seeks relief against "the Defendants," CMFL is not mentioned by name within the substantive allegations outlined under the Count One heading. I do not, however, find that this should be determinative of whether the plaintiffs have failed to properly state a claim against CMFL for violation of the RICO Act. In its brief in support of the Motion, (Docket Item No. 136), (Memorandum In Support Of Motion For Judgment On The Pleadings, ("CMFL's Brief")), CMFL contends that the plaintiffs failed to properly allege that it participated in the operation or management of the two named enterprises, i.e., VFI and Treads. While it is true that this fact is not specifically alleged within the confines of Count One, I find that it is sufficiently alleged elsewhere in the Amended Complaint along with sufficient facts to establish a plausible civil RICO Act claim against CMFL. *See Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.,* 576 F.3d 172, 176 (4th Cir. 2009) (complaint must be viewed in its entirety when ruling on a Rule 12(b)(6)

motion).

The plaintiffs did reallege and incorporate paragraphs 1-419 of the Amended Complaint into each specific count. In the introductory paragraphs, the Amended Complaint contains a number of allegations of actions that Luther Boyd took as president of CMFL. (Amended Complaint at 47-65.) Those allegations claim that Luther Boyd, as president of CMFL, had CMFL conduct business dealings for Treads to set up an illegal kickback scheme with AKZO, Treads's supplier of finishes and coatings. (Amended Complaint at 47-65.) The Amended Complaint also details in a number of places how Luther Boyd and others had various expenses owed by CMFL paid for by VFI or otherwise directed the use of VFI funds. (Amended Complaint at 33-37.) While each of these allegations do not repeat that Luther Boyd and others were acting as an agent for CMFL, the Amended Complaint does allege that, during the relevant time period, Luther Boyd was president of CMFL. In Count Two, which alleges a RICO Act conspiracy, the plaintiffs allege that the "Defendants" collectively controlled VFI and Treads. (Amended Complaint at 91.) I find that these allegations are sufficient to adequately plead that CMFL also controlled the enterprises.

In Count Two, the plaintiffs assert a RICO Act conspiracy claim, alleging that, at all relevant times, the parties in this action were "persons" within the meaning of 18 U.S.C. §§ 1961(3), 1962(d) and 1964(c). (Amended Complaint at 91.) The plaintiffs particularly state that Luther Boyd, Teresa Colston-Boyd, Boyd LP I, CMFL, CMHF, CWW, SHF, Jessee Boyd and the other co-conspirators were persons under the RICO Act and that the defendants "controlled VFI and Treads and engaged in racketeering activities for the purpose of defrauding the [p]laintiffs." (Amended Complaint at 91.)

In relevant part, the plaintiffs also allege that "Boyd LP I, and its general partners Teresa Colston-Boyd and Luther Boyd, controlled VFI and Treads[.]" (Amended Complaint at 92.) The plaintiffs further allege that the defendants and the co-conspirators each were associated with the enterprises and that they agreed and conspired to violate 18 U.S.C. § 1962(c). (Amended Complaint at 92.) According to the plaintiffs, the defendants and other co-conspirators also "committed and/or caused to be committed a series of overt acts in furtherance of the [c]onspiracy and to affect the objects thereof[.]" (Amended Complaint at 92.) Moreover, the plaintiffs allege that, as a result of the defendants' and co-conspirators' fraudulent misstatements, which were detrimentally relied upon by the plaintiffs, and the defendants' misconduct, each of the plaintiffs was directly and proximately injured in its business or property by the predicate acts of the defendants. (Amended Complaint at 92.)

To prove a RICO Act conspiracy under 18 U.S.C. § 1962(d), the plaintiffs must show that the defendants conspired to violate 18 U.S.C. § 1962(c). *See Palmetto State Med. Ctr., Inc. v. Operation Lifeline*, 117 F.3d 142, 148 (4th Cir. 1997). In examining these allegations, it is readily apparent that the language the plaintiffs omitted from Count One was included in Count Two. In Count Two, although the allegations again seem to focus on the actions of Boyd LP I and Luther Boyd and Teresa Colston-Boyd in their capacities as general partners of Boyd LP I, the plaintiffs allege that CMFL, and other named defendants "controlled VFI and Treads and engaged in racketeering activities for the purpose of defrauding the [p]laintiffs." (Amended Complaint at 91.) The use of the word "controlled" indicates that the plaintiffs contend that CMFL and the others conducted and participated in the direction of the enterprises' affairs. Thus, on its face, it appears that the plaintiffs have alleged enough to assert a plausible RICO

Act conspiracy claim to show that CMFL and the other defendants violated the RICO Act by "conduct[ing] or participat[ing], directly or indirectly, in the conduct of [VFI's and Treads's] affairs through a 'pattern of racketeering activity' . . . ." 18 U.S.C. § 1962(c). (Amended Complaint at 92.)

RICO Act liability is reserved for "ongoing unlawful activities whose scope and persistence pose a special threat to social well-being." *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989) (quoting *Int'l Data Bank, Ltd. v. Zepkin,* 812 F.2d 149, 155 (4th Cir. 1987)). The Fourth Circuit has consistently cautioned against finding a RICO Act violation in a "garden-variety fraud," particularly when the alleged pattern of racketeering relies solely on predicate acts of mail or wire fraud. *Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000); *see also Flip Mortgage Corp. v. McElhone*, 841 F.2d 531, 538 (4th Cir. 1988). A pattern of racketeering activity requires at least two acts of such activity. *See* 18 U.S.C. § 1961(5). Although a minimum of two predicate acts is required, two acts alone do not necessarily establish a pattern of racketeering activity. *See H. J. Inc. v. N. Bell Tel. Co.,* 492 U.S. 229, 239 (1989). In order to establish a pattern of racketeering activity, the plaintiff must show that the predicate acts are related and that they "amount to or pose a threat of continued criminal activity." *H.J. Inc.*, 492 U.S. at 239. As such, the court must evaluate the alleged acts based upon the relatedness of the predicate acts and based upon the overall continuity of the activities.

First, with regard to the relatedness or relationship prong, a plaintiff must show "criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics

and are not isolated events." *H.J. Inc.*, 492 U.S. at 240 (where the Court adopted the definition set forth in 18 U.S.C. § 3575(e)). As for the continuity prong, the Court has explained that there is both a closed-ended and open-ended continuity concept. *See H.J. Inc.*, 492 U.S. at 241-42. Continuity refers "either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241. Closed-ended continuity can be shown through a "series of related predicates extending over a substantial period of time." *H.J. Inc.*, 492 U.S. at 242. Predicate acts extending over a few weeks or months which offer no threat of future criminal activity do not satisfy this requirement, as Congress's intent under the RICO Act was to target long-term criminal conduct. *See H.J. Inc.*, 492 U.S. at 242. Open-ended continuity may be established where, for example, the "related predicates themselves involve a distinct threat of long-term racketeering activity" or where the predicate acts "are part of an ongoing entity's regular way of doing business . . . or of conducting or participating in an ongoing and legitimate RICO 'enterprise'." *H.J. Inc.*, 492 U.S. at 242-43.

The Fourth Circuit has explained that there are no mechanical rules in determining whether a pattern of racketeering activity has taken place. *See Parcoil Corp. v. NOWSCO Well Serv., Ltd.*, 887 F.2d 502, 504 (4th Cir. 1989). However, such a determination is "'a matter of criminal dimension and degree to be decided on a case-by-case basis.'" *Parcoil Corp.*, 887 F.2d at 504 (citing *Brandenburg*, 859 F.2d at 1185). As the Fourth Circuit stated in *Brandenburg*, when assessing whether a pattern has been shown, several factors should be considered, such as "the number and variety of predicate acts and the length of time over which they were committed, the number of putative victims, the presence of separate schemes, and the potential for multiple

distinct injuries." 859 F.2d at 1185. Thus, those factors, as well as the facts and circumstances before the court, "with special attention to the context in which the predicate acts occurr[ed,]" should be evaluated. *Brandenburg*, 859 F.2d at 1185.

The case at hand presents a rather complex set of factual allegations that show a variety of business transactions that allegedly benefitted Luther Boyd and Teresa Colston-Boyd and several business entities with which they were involved and essentially controlled. Among the arguments asserted by the defendants is the contention that the time frame involved is not long enough to establish a pattern of racketeering activity. In fact, the defendants point out that VFI was organized in December 2005 and that Luther Boyd left the management of VFI in February 2008. Similarly, the defendants point out that investment in Treads began in September 2006, and Luther Boyd was removed from management in June 2008. So, according to the defendants, the alleged activities occurred for a period of just more than two years. CMFL cites the case of *GE Inv. Private Placement Partners II v. Parker,* 247 F.3d 543, 550 (4th Cir. 2001), in which the Fourth Circuit found that the plaintiffs had failed to state a proper RICO Act claim, noting that the period of activity lasted for "only about two years." While the relevant time frame is certainly an important factor to consider, as discussed above, when examining whether a pattern of racketeering activity has occurred, such a determination is factually sensitive and must be viewed on a case-by-case basis. *See Brandenburg*, 859 F.2d at 1185. So, while the time frame of the alleged activities will be taken into consideration, it will not be determinative as to whether a pattern of racketeering activity took place.

Not only do we have allegations before the court that the activity occurred for

a minimum of more than two years, we also have allegations that multiple entities, investors and individuals were harmed. In this case, VFI, Treads, Nicewonder LP I and Burke LP I claim to have been negatively impacted by the business dealings initiated by Luther Boyd, Teresa Colston-Boyd and several entities with which they were involved. Not only were the entities themselves harmed, but the plaintiffs claim that the members, owners and investors of each entity were financially damaged as well.

Furthermore, as indicated in the Amended Complaint, defendant CMFL also was victimized by the alleged schemes. The fact that the plaintiffs have asserted these claims against CMFL, while also alleging that CMFL was a victim, creates a rather intriguing issue for the court to consider. By claiming that CMFL was a victim, the argument could be made that CMFL was a part of the enterprise. An enterprise, which must be shown to exist under the RICO Act, is defined as "an ongoing organization, formal or informal, in which the various associates function as a continuing unit." *Palmetto*, 117 F.3d at 148. Here, the plaintiffs allege that VFI and Treads are the enterprise because they were victimized by the fraudulent scheme. The court notes that CMFL also was alleged to have been a victim, as it, too, was damaged by the alleged business negotiations and practices carried out by Luther Boyd and Teresa Colston-Boyd as individuals and through various entities owned or controlled by them. It is well-settled that the "enterprise must be distinct from the persons alleged to have violated § 1962(c)." *Palmetto*, 117 F.3d at 148; *see also New Beckley Mining Corp. v. Int'l Union, United Mine Workers of Am.*, 18 F.3d 1161, 1163 (4th Cir. 1994); *Busby v. Crown Supply, Inc.*, 896 F.2d 833, 840 (4th Cir. 1990); *United States v. Computer Sciences Corp.*, 689 F.2d 1181, 1190 (4th Cir. 1982).

Many of the factual allegations by the plaintiff clearly claim that CMFL was a victim of the fraudulent scheme. (Amended Complaint at 9, 38-43, 47-64.) Thus, it is plausible that, based on the pleadings as they are set forth, CMFL, which is a named defendant, could be considered part of the enterprise, and, thus, not separate and distinct as required by law. *See Palmetto*, 117 F.3d at 148. However, outside of noting that CMFL was a victim in certain circumstances, the plaintiffs did not specifically plead that CMFL was a part of the enterprise; instead, VFI and Treads were the only entities named as enterprises. Furthermore, this court has found no binding authority to stand for the proposition that a RICO Act victim cannot also be a named defendant. The factual allegations show that CMFL, through the actions of Luther Boyd, its president and director, engaged in activities and business dealings that were aimed at furthering the criminal activity. At times, the plaintiffs failed to allege that the actions of Luther Boyd were performed in his role and capacity with CMFL. However, in the Amended Complaint, Luther Boyd is referred to, in general, as a "disloyal agent," indicating that his actions were performed as a disloyal agent to the companies with which he was associated. (Amended Complaint at 2.)

The Amended Complaint alleges that CMFL, through its president and director Luther Boyd, negotiated the deals with Akzo, which were a part of the kickback scheme. (Amended Complaint at 2.) The Amended Complaint further alleges that CMFL was directed by Luther Boyd to pay certain invoices, placing them in the United States mail, which was critical in carrying out the fraudulent scheme. In particular, the plaintiffs allege that Luther Boyd, acting as the disloyal and adverse manager of VFI and Treads, and as the president of CMFL, intentionally and with specific intent to engage in a scheme to defraud, entered into negotiations with Akzo. (Amended

Complaint 47-48.) Boyd requested and then agreed to be charged 10 percent higher than market price by Akzo for items such as stains, fillers, sealer and topcoat products, in exchange for CMHF receiving a quarterly "rebate" of the surcharged amounts. (Amended Complaint at 48.) In October 2006, Luther Boyd allegedly directed that all stains, fillers, sealer and topcoat products needed by VFI, Treads and CMFL be ordered from Akzo. (Amended Complaint at 49-50.) The Amended Complaint alleges a number of specific instances where CMFL paid specific inflated invoices and charged the inflated prices to Treads. (Amended Complaint at 54-61.) As a result of the payments that CMFL sent to Akzo, allegedly with specific intent to engage in a scheme to defraud, Akzo mailed quarterly payments of $16,208.28, $6,878.79, $6,869.62 and $4,804.30 to CMHF at a private UPS box in Abingdon, Virginia, for the rebate or refund that had been agreed to by Akzo and Luther Boyd. (Amended Complaint at 61-64.) The checks from Akzo were deposited into CMHF's account at a bank in Bristol, Tennessee, and CMHF concealed the identity of the payor, the nature of the payment on its books and its unlawful activity of accepting Akzo's kickbacks from the members of VFI and Treads and the other shareholders of CMFL. (Amended Complaint at 61-64.) The Amended Complaint's allegations that CMFL mailed numerous checks to Akzo were essential in carrying out the fraudulent scheme allegedly created by the Boyds that was achieved through an unlawful agreement with Akzo. All of these actions were part of a common plan and scheme, i.e., to financially benefit the Boyds and certain entities which they controlled. Based upon the allegations before the court, the actions of CMFL, as directed by Luther Boyd, were necessary to carry out the scheme.

The undersigned recognizes that most of the allegations that pertain to CMFL

are related to actions in which it played a role, allegedly with the intent to engage in a fraudulent scheme, in carrying out mail and wire fraud. As noted above, the Fourth Circuit has shown a reluctance to find a RICO Act violation in cases involving "garden-variety fraud," especially when the allegations of a pattern of racketeering activity are based solely on predicate acts of mail or wire fraud. *See Al-Abood*, 217 F.3d at 238. However, although the bulk of the allegations specifically related to CMFL include its participation in the mailing of certain payments with the specific intent to engage in a fraudulent scheme, the plaintiffs also set forth allegations of other predicate acts by other named defendants. It is obvious from the facts before the court, as alleged by the plaintiffs, that CMFL's participation was critical in carrying out the fraudulent scheme. In fact, the payments sent to Akzo proved to be a key step in the kickback scheme which required Akzo to remit payments to CMHF.

These allegations, if true, involve "a distinct threat of long-term racketeering activity" and have shown that the Boyds created an environment where the predicate acts, such as those carried out by CMFL, were "part of an ongoing entity's regular way of doing business" and showed that CMFL conducted or participated in an ongoing and legitimate RICO enterprises. *H.J. Inc.*, 492 U.S. at 242-43. Thus, for the reasons stated above, the undersigned finds that, due to the complexities involved in this particular case, and CMFL's alleged involvement in such activities, the situation before the court does not amount to garden-variety fraud; instead, it represents a rather complex scheme, initiated and created by the Boyds and furthered by certain entities which they controlled. This scheme resulted in damages to the named enterprises, as well as limited partnerships such as Nicewonder LP I and Burke LP I, as the Boyds and CMFL, through their illegal negotiations and agreements, created a detailed scheme

that enriched the Boyds and certain entities, particularly CMHF, which allegedly received the kickback payments.  Therefore, the undersigned is of the opinion that a sufficient pattern of racketeering activity has been shown and that CMFL's Motion should be denied as to Counts One and Two.

*B.  Statutory Conspiracy & Common Law Conspiracy Claims*

The plaintiffs assert several conspiracy claims against the defendants under both statutory and common law theories.  In CMFL's Brief, with respect to the conspiracy claims in Counts Six, Eight, Nineteen, Twenty, in part, Twenty-One, in part, Twenty-Two, in part, Twenty-Three, in part, and Twenty-Four, in part, the defendants argue that the claims should be dismissed because it is a legal impossibility for CMFL to conspire with its own employees.  In making this argument, CMFL points out that the majority of the allegations in the Amended Complaint reference either bad acts of which CMFL was a victim,  such as the kickback schemes, or bad acts which "had nothing to do with CMFL or nothing to do with the [p]laintiffs."  (CMFL's Brief at 11.)  CMFL further notes that the only bad acts of the plaintiffs from which it benefitted were in relation to certain intercompany payments.  (CMFL's Brief at 11-12.)  As to the contention that CMFL cannot be liable for the claims against it because the Amended Complaint contains certain instances in which CMFL was a victim, the undersigned finds this assertion unpersuasive.  The defendants have failed to present any mandatory authority, in either the RICO context or in the context of statutory or common law conspiracy claims, that prohibits a party from bringing a claim against an entity where it also is alleged that the entity was victimized.  Thus, the court must examine whether the plaintiffs properly set forth such claims against CMFL.

As noted by the defendants, the Supreme Court of Virginia has stated that a conspiracy between a principal and an agent is a legal impossibility because they do not constitute separate persons for the purposes of establishing a conspiracy. *See Charles E. Brauer Co. v. NationsBank of Va., N.A.*, 466 S.E.2d 382, 387 (Va. 1996). As such, the Supreme Court of Virginia has held that a single entity cannot conspire with itself. *See Brauer*, 466 S.E.2d at 387 (citing *Fox v. Deese*, 362 S.E.2d 699, 708 (Va. 1987)). Relying on these principles, the defendants contend that it was a legal impossibility for CMFL to conspire with Luther Boyd, its president and director, or Brian Fuller, a former CMFL employee, to defraud the plaintiffs.

The plaintiffs recognize this general rule, but note that it is inapplicable in this case. Specifically, the plaintiffs argue that when a third person or entity is introduced to the conspiracy allegation, the rule has no application. The plaintiffs rely on a Supreme Court of Virginia decision where the court stated that, because a corporation cannot conspire with itself, a third party is necessary to create an actionable conspiracy. *See Bowman v. State Bank of Keysville*, 331 S.E.2d 797, 801 (Va. 1985). In that particular case, the court was dealing with a conspiracy to induce a breach of contract. *See Bowman*, 331 S.E.2d at 801. However, in reading the court's rationale, it is the undersigned's opinion that such a proposition is not limited solely to breach of contract conspiracies; instead, it appears to apply to all conspiracies since it is impossible for a corporation to conspire with itself.

In this case, the plaintiffs did not allege conspiracies between only CMFL and Luther Boyd. The plaintiffs actually alleged various conspiracy claims aimed at a variety of parties, including Teresa Colston-Boyd, Luther Boyd, CMFL, Boyd LP I,

SHF, CMHF, Brian Fuller and CWW.  Therefore, it is readily apparent that the plaintiffs made allegations against multiple third parties.  The court recognizes that some of the other entities named were entities with which both Luther Boyd and Teresa Colston-Boyd were involved.  However, the allegations do not specifically state that the conspiracy allegations were aimed at Luther Boyd or Teresa Colston-Boyd in their capacities or roles with those entities.  The allegations simply named the Boyds as individuals.  Furthermore, it is clear from the Amended Complaint that the plaintiffs allege that others, from whom they seek no recovery in this case, were co-conspirators.  Those alleged co-conspirators would include Robin Yuan, Yuan's two corporations and Akzo. As such, the undersigned is of the opinion that CMFL's argument is without merit.  Because third parties were involved, the court is of the opinion that the general rule that a corporation cannot conspire with itself is inapplicable.

Moreover, the court notes that Counts Six, Eight, Eighteen, Nineteen, Twenty, Twenty-One, Twenty-Two, Twenty-Three, and Twenty-Four of the Amended Complaint set forth claims of statutory conspiracy pursuant to Virginia Code §§ 18.2-499 and 18.2-500 and common law conspiracy.  Under Virginia law, statutory conspiracy requires a showing that two or more people "combined, associated, agreed, or acted in concert together for the purpose of willfully and maliciously" injuring the plaintiff in its business "by any means whatever." *Advanced Marine Enters., Inc. v. PRC Inc.*, 501 S.E.2d 148, 159 (Va. 1998).  Similarly, "'[a] common law conspiracy consists of two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means.'" *The Country Vinter, Inc. v. Louis Latour, Inc.*, 634 S.E.2d 745, 751 (Va. 2006) (quoting *Commercial Bus. Sys. v. BellSouth Servs.*, 453 S.E.2d 261, 267 (Va.

1995)); *see also Hechler Chevrolet v. Gen. Motors Corp.*, 337 S.E.2d 744, 748 (Va. 1985).

As discussed in *The Country Vinter, Inc.*, the Supreme Court of Virginia considered the issue of whether Virginia Code § 18.2-499 would abrogate common law conspiracy claims. The court stated that such a question was resolved by familiar principles:

> The common law will not be considered as altered or changed by statute unless the legislative intent is plainly manifested. A statutory change in the common law is limited to that which is expressly stated or necessarily implied because the presumption is that no change was intended. When an enactment does not encompass the entire subject covered by the common law, it abrogates the common-law rule only to the extent that its terms are directly and irreconcilably opposed to the rule.

*The Country Vinter, Inc.*, 634 S.E.2d at 751 (quoting *Couplin v. Payne*, 613 S.E.2d 592, 595 (Va. 2005)). Furthermore, only common law claims that fall squarely within the confines of an applicable statute will be preempted by that statute. *See Schlegel v. Bank of Am.*, 628 S.E.2d 362, 368 (Va. 2006). Here, the conspiracy statute requires a showing of willful and malicious actions, which is not specifically required in a common law conspiracy claim. Thus, because the common law conspiracy requirements do not fall squarely within the confines of the statute, the undersigned is of the opinion that the plaintiffs are permitted to proceed on the alternative claims, both statutory and common law conspiracy.

In examining the Amended Complaint, the allegations within Counts Six, Eight,

Nineteen, Twenty, Twenty-One, Twenty-Two, and Twenty-Four all outline the necessary elements required to adequately state conspiracy claims against CMFL.[5]  In addition, in each of the counts, the plaintiffs outline several factual allegations that, when viewed in the light most favorable to the plaintiffs, indicate that a conspiracy to harm VFI, Treads, Nicewonder LP I and Burke LP I may have occurred.  Thus, for the reasons stated above, the undersigned recommends that CMFL's Motion be denied as to Counts Six, Eight, Nineteen, Twenty, Twenty-One, Twenty-Two and Twenty-Four, as I am of the opinion that the plaintiffs sufficiently stated plausible conspiracy claims against CMFL and the other defendants.

*C.  Conversion Claims*

In the Motion, CMFL also argues that the plaintiffs' claims of conversion should be dismissed, asserting that the plaintiffs failed to sufficiently allege that anything obtained by CMFL was property that would support a claim for conversion.  In Virginia, it is well-settled that "[c]onversion is any wrongful exercise or assumption of authority . . . over another's goods, depriving him of their possession ... [and any] act of dominion wrongfully exerted over property in denial of the owner's right, or inconsistent with it . . . ."  *Universal C.I.T. Credit Corp. v. Kaplan*, 92 S.E.2d 359, 365 (Va. 1956); *see also Airlines Reporting Corp. v. Pishvaian*, 155 F. Supp. 2d 659, 663-64 (E.D. Va. 2001); *Economopoulos v. Kolaitis*, 528 S.E.2d 714, 719 (Va. 2000).  As such, in order to properly assert a claim for conversion, a plaintiff must allege (1) the ownership or right to possession of the property at the time of the conversion; and (2)

---

[5]While Count Eight survives based upon the above analysis and reasoning, it will, ultimately, be recommended to be dismissed for reasons stated in a subsequent section.

the wrongful exercise of dominion or control by the defendant over the plaintiff's property, thereby depriving the plaintiff of possession of the property. *See Airlines Reporting Corp.*, 155 F. Supp. 2d at 664 (citing *Universal*, 92 S.E.2d at 365). Furthermore, "[a]n action for conversion can be maintained only by the person having a property interest in and entitled to the immediate possession of the item alleged to have been wrongfully converted." *Economopoulos*, 528 S.E.2d at 719 (citing *United Leasing Corp. v. Thrift Ins. Corp.*, 440 S.E.2d 902, 906 (Va. 1994)).

Counts Seventeen, Twenty-Three and Twenty-Eight all set forth allegations of conversion against CMFL and other named defendants. In Count Seventeen, the plaintiffs specifically allege that CMFL and other defendants "wrongfully exercised and assumed dominion and control over the equipment purchased by Treads, authority of the contents of the Treads website . . . , took possession of the displays made for and paid for by Treads, . . . took possession of the shelving purchased by Treads and took control of inventory purchased by Treads thereby depriving Treads of the possession of both its mark and web domain." (Amended Complaint at 125.) Count Twenty-Three alleges that CMFL and others conspired to commit conversion against VFI. The plaintiffs claim that CMFL and others "form[ed] a conspiracy and did conspire and combine . . . to willfully take and convert the property of VFI and to use that property for their own purposes or the purposes of their companies CMFL or CMHF . . . to willfully fail to timely create invoices or to timely pay for the property." (Amended Complaint at 135.) In Count Twenty-Eight, the plaintiffs claim that CMFL and others committed conversion against VFI. In particular, the plaintiffs allege that CMFL and other named defendants "wrongfully exercised or assumed authority over the goods, machinery and/or other personal property of VFI depriving [it] of possession [and that

they] wrongfully exert[ed] dominion over the property of VFI in denial of and inconsistent with [] VFI's rights." (Amended Complaint at 143.)

In the plaintiffs' Brief in Opposition, the plaintiffs outline several instances in which they argue that CMFL committed conversion. In outlining these instances, the plaintiffs reference certain factual allegations contained in the Amended Complaint. After reviewing the factual allegations upon which the plaintiffs rely, I am of the opinion that these allegations do not amount to claims of conversion.

First, the plaintiffs claim that wood owned by VFI was seized and that Luther Boyd and his son loaded their vehicles with the VFI wood and never compensated the company for its costs. (Amended Complaint at 37.) In examining this factual allegation, it is readily apparent that the plaintiffs do not allege that CMFL, or anyone acting specifically on CMFL's behalf, was involved in the taking of the wood. In fact, it is precisely alleged that Boyd LP I and individuals Luther Boyd and Jessee Boyd were responsible for such actions. At no point do the plaintiffs say that CMFL carried out these actions, that Luther Boyd was acting in his capacity as CMFL's president and director or that CMFL received any gain as a result of this.

The plaintiffs also claim that CMFL converted the labels from the finishing lines, which caused the identity of the machine's manufacturer to be concealed. In other words, the plaintiffs assert that CMFL deliberately removed and hid labels from the machines. These allegations do not state a sufficient claim of conversion because such alleged actions did not deprive the rightful owners of use and possession of the property at issue, the finishing machines. *See generally Airlines Reporting Corp.*, 155 F. Supp.

2d at 664. At most, these general allegations set forth some type of fraudulent misrepresentation, but they certainly do not sufficiently state a claim of conversion.

Next, the plaintiffs state that VFI was charged for advertising displays, which were never given to them and that were instead taken and controlled by CMFL. In the Amended Complaint, the plaintiffs allege that Luther Boyd falsely represented that VFI had six displays in place; however, according to the plaintiffs, "the only known flooring displays that were ever placed were those of CMFL and most of those were located at the entranceways to New Peoples Bank branches" despite the fact that VFI was charged tens of thousands of dollars for the displays by CMFL and other vendors. (Amended Complaint at 34.) Thus, based upon the pleadings, it appears that CMFL actually owned the only flooring displays mentioned. Therefore, if the only known displays were actually owned by CMFL, it is impossible for it to have committed conversion. The undersigned recognizes that the plaintiffs are arguing that VFI was charged for displays that it never received. However, there are no factual allegations to support such a claim. Instead, once again it appears that fraudulent misrepresentations by Luther Boyd are at the heart of the allegations. There are no allegations stating that Luther Boyd was acting in his role as president and director of CMFL when these actions took place. Furthermore, as stated above, the only known flooring displays, as stated in the pleadings, were actually owned by CMFL. *See Economopoulos*, 528 S.E.2d at 719 (only a person having a property interest in and entitled to possession of the item can maintain an action for conversion). Therefore, the plaintiffs have failed to sufficiently state a claim of conversion against CMFL as to this particular issue.

Lastly, the remaining allegations of conversion are related to expenses of CMFL

that were allegedly charged to VFI. In support of these claims, the plaintiffs rely upon the allegations within paragraph 159 of the Amended Complaint. (Amended Complaint at 36-37.) Upon review of these allegations, the plaintiffs plainly state that Boyd LP I, and/or its agents, were responsible for the charges and expenses that were shifted to VFI. At no point do the plaintiffs allege that CMFL, or Luther Boyd in his capacity as CMFL president and director, caused these expenses to be charged to VFI. Even if those allegations had been made, however, it again appears that these allegations are all based upon fraudulent misrepresentations by Boyd LP I or Luther Boyd and, thus, do not rise to the level of a proper claim for conversion. Accordingly, for the reasons stated above, the undersigned is of the opinion that the plaintiffs failed to properly state claims of conversion against CMFL. As such, it is recommended that Counts Seventeen, Twenty-Three and Twenty-Eight be dismissed as to CMFL.

## D. Miscellaneous Claims

CMFL also argues that Counts Three, Four, Five, Fifteen through Eighteen, Twenty, in part, Twenty-One, in part, Twenty-Two, in part, Twenty-Three, in part, Twenty-Four, in part, Twenty-Five through Twenty-Seven and Twenty-Nine of the Amended Complaint should be dismissed, claiming that the counts involve no allegations against it. (CMFL's Brief at 10-11.) CMFL points out that, in the Amended Complaint, the plaintiffs fail to specifically seek relief against CMFL on several counts. In fact, as to Counts Nine, Ten, Twelve, Thirteen, Twenty-Five, Twenty-Six, Twenty-Seven and Twenty-Nine, the plaintiffs' prayer for relief did not include any requested relief against CMFL.

The undersigned notes that it agrees with CMFL as to these particular counts. Because no relief was sought against CMFL, it is only logical to assume that these particular counts are not aimed at CMFL, or any wrongdoing by CMFL. In the plaintiffs' Brief in Opposition, it is explained that a scrivener's error occurred in certain instances and that CMFL was intended to be named in the those counts. If that is the case, the plaintiffs would be permitted to seek leave to file a second amended complaint. The plaintiffs also point out that, although not named in certain counts, the fact that they incorporated paragraphs 1-419 shows that all counts set forth claims against CMFL. I disagree. Had the plaintiffs intended to specifically assert claims against CMFL on all counts, then, in the prayer for relief section, CMFL would have been named in each and every count. As such, the undersigned recommends that Counts Nine, Ten, Twelve, Thirteen, Fifteen, Sixteen, Twenty-Five, Twenty-Six, Twenty-Seven and Twenty-Nine be dismissed against CMFL, as no relief was sought against them for those particular claims.

The court now will address Counts Three, Four, Seven, Nine and Eleven. In these counts, the plaintiffs sought relief against CMFL, but did not make reference to CMFL in the substantive allegations within or directly following the headings of each of the counts in the Amended Complaint. In Count Three, the plaintiffs allege a violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), against CMHF, Teresa Colston-Boyd, Boyd LP I and Luther Boyd, with no reference at all to CMFL or its former employee Brian Fuller. In Count Four, the plaintiffs assert a cybersquatting claim against CMHF, Teresa Colston-Boyd, Luther Boyd and Boyd LP I, with absolutely no mention of Fuller or CMFL other than their inclusion in the prayer for relief. Counts Seven, Nine and Eleven each attempt to state conspiracy claims in

varying combinations against Teresa Colston-Boyd, Luther Boyd, Boyd LP I, SHF, CMHF and Brian Fuller. Counts Seven and Nine contain no substantive allegations against CMFL or Fuller. Count Eleven does make reference to Fuller, but does not mention CMFL or that Fuller was acting within his scope of employment for CMFL. CMFL is included in the prayer for relief for Counts Seven, Nine and Eleven, while Fuller is included in the prayer for relief only in Count Eleven.

CMFL argues that Counts Three, Four, Seven, Nine and Eleven should be dismissed because the substantive allegations in the Amended Complaint fail to mention it. (CMFL's Brief at 10-11). In particular, CMFL notes that the previously mentioned counts deal with property and contracts allegedly taken or interfered with by CMHF and others. (CMFL's Brief at 11.) In reviewing the allegations contained within these counts, it is clear that Counts Three, Four, Seven, Nine and Eleven fail to allege anything against CMFL. The undersigned recognizes that the plaintiffs incorporated paragraphs 1-419 into each of the counts. Nonetheless, as noted by CMFL, the substantive allegations listed under the heading for Counts Three, Four, Seven, Nine and Eleven contain no specific mention of CMFL.

As to Counts Three, Four and Eleven, while CMFL is not specifically referenced, the plaintiffs do mention Fuller, a former CMFL employee. The court is well aware of the general principles of respondeat superior and the principal-agent relationship, which state that an entity or employer can be held liable for the actions of its employees for actions performed within the scope of their duties. *See generally McDonald v. Hampton Training Sch. for Nurses*, 486 S.E.2d 299, 300-01 (Va. 1997); *Commercial Bus. Sys.*, 453 S.E.2d at 265. However, as stated in the Amended Complaint, from

approximately January 2007 to November 2007, "Boyd LP I effected the lease of CMFL's employee, Brian Fuller, to Treads to assist in the development of the Treads website for Treads and to set up the Treads computer system." (Amended Complaint at 66.) Thus, the allegations that specifically reference or include Fuller are related to the time period in which he essentially worked at the direction of someone other than CMFL. In fact, with respect to Counts Three, Four and Eleven, the allegations against Fuller were based upon his actions pursuant to instructions by Teresa Colston-Boyd, and, at times, Luther Boyd, in their roles as general partners of Boyd LP I or in their roles with CMHF. At no point in the substantive allegations of these counts did the plaintiffs allege that Fuller was acting within the scope of his employment with CMFL. The allegations preceding the outlined counts indicate that Teresa Colston-Boyd, in her roles with CMHF and Boyd LP I, directed Fuller to carry out certain tasks that the plaintiffs claim caused them harm. (Amended Complaint at 66-68.)

Based upon my review of the allegations contained in the Amended Complaint, any actions alleged to have been taken by Fuller were not taken in his capacity as an employee for CMFL. Furthermore, the substantive allegations of Counts Three, Four, Seven, Nine and Eleven contain no reference to CMFL, other than simply including its name within the prayer for relief. Thus, it is recommended that Counts Three, Four, Seven, Nine and Eleven be dismissed against CMFL, as the substantive allegations set forth as to each count failed to reference CMFL, and the plaintiffs have failed to allege any plausible claims against it.

CMFL also argues that Counts Five, Eight, Fourteen, Fifteen, Sixteen, Seventeen, Eighteen, Twenty, in part, Twenty-One, in part, Twenty-Two, in part, and Twenty-Four,

in part, should be dismissed against CMFL because the Amended Complaint contains no factual allegations that CMFL, as opposed to CMHF or others, had anything to do with the use of any of the plaintiffs' alleged property. (CMFL's Brief at 11.) In Counts Five, Eight, Fourteen, Fifteen and Sixteen, the plaintiffs assert various claims against CMFL, all of which relate to the actions of former CMFL employee, Brian Fuller. In particular, these counts include claims of copyright infringement, statutory conspiracy, tortious interference with a contract and common law unfair competition for trade name and trademark infringement. As explained earlier, the allegations of wrongdoing that could possibly be attributed to CMFL through Fuller's actions are related to a time period in which he basically worked at the direction of someone other than CMFL. Just as was the case with the previous counts, Counts Five, Eight, Fourteen, Fifteen and Sixteen all involve allegations against Fuller based upon actions he carried out at the direction of Teresa Colston-Boyd, and, at times, Luther Boyd, in their roles as general partners of Boyd LP I or in their roles with CMHF. At no point in the substantive allegations of these counts did the plaintiffs allege that Fuller was acting within the scope of his employment with CMFL. The allegations preceding the outlined counts indicate that Teresa Colston-Boyd, in her roles with CMHF and Boyd LP I, directed Fuller to carry out certain computer tasks that allegedly impacted Treads's intellectual property. (Amended Complaint at 66-68.) Thus, for the reasons stated above, it is recommended that Counts Five, Eight, Fourteen, Fifteen and Sixteen be dismissed against CMFL because the substantive allegations set forth as to each count fail to allege any plausible claims against it, as the actions of Fuller were not performed in his capacity as a CMFL employee.[6]

_____

[6]CMFL also contends that Counts Seventeen, Twenty, in part, Twenty-One, in part, Twenty-Two, in part, Twenty-Three, in part, and Twenty-Four should be dismissed. The undersigned sees no reason to again address these particular counts, as they have been discussed

*E. Standing Claim*

Lastly, CMFL argues that all plaintiffs do not have standing for every count. According to CMFL, Treads and VFI are the only plaintiffs with standing, not the owners of Burke LP I and Nicewonder LP I. (CMFL's Brief at 16-17.) CMFL specifically relies on persuasive authority from other circuits where the courts have held that there is no shareholder standing under the RICO Act to redress injuries to a corporation in which the shareholder has stock. *See Manson v. Stacescu*, 11 F.3d 1127, 1131 (2d Cir. 1993); *see also Rylewicz v. Beaton Servs., Ltd.*, 888 F.2d 1175, 1179 (7th Cir. 1989) (holding that a shareholder cannot maintain an action under the RICO Act for diminution in value of stock); *Warren v. Mfrs. Nat. Bank of Detroit*, 759 F.2d 542, 544 (6th Cir. 1985); *Stevens v. Lowder*, 643 F.2d 1078, 1080 (5th Cir. 1981).

The undersigned recognizes these general principles. However, as noted by the plaintiffs, these principles also were recognized in an unpublished opinion from the United States Court of Appeals for the Fourth Circuit. In *Lyon v. Campbell*, the Fourth Circuit, relying upon the *Manson* case from the Second Circuit, noted that "a shareholder may maintain an action under RICO ... 'where the injury sustained by the shareholder is separate and distinct from that sustained by other shareholders.'" 1994 U.S. App. LEXIS 17388, at *12 n.2 (4th Cir. July 15, 1994) (quoting *Manson*, 11 F.3d at 1131)). The court notes that unpublished opinions in the Fourth Circuit have no

at earlier points in the Report and Recommendation.

As to Count Eighteen, for the same reasons addressed in the previous discussion regarding the conspiracy claims, the undersigned is of the opinion that the plaintiffs have set forth sufficient allegations to assert a plausible claim.

precedential value and are only entitled to the weight generated by the persuasiveness of their reasoning. *See Collins v. Pond Creek Mining Co.*, 468 F.3d 213, 219 (4th Cir. 2006); *see also* FOURTH CIRCUIT COURT OF APPEALS LOCAL RULE 36(c). In *Lyon*, the court did not delve into a lengthy discussion of shareholder standing, but it clearly recognized the standards set forth in the *Manson* case. The undersigned is persuaded by the court's recognition and reliance upon the "separate and distinct" requirement that permits shareholder standing in RICO Act cases. *See Manson*, 11 F.3d at 1131.

In this case, it is alleged that Nicewonder LP I and Burke LP I both invested significant sums of money into both Treads and VFI. In fact, according to the plaintiffs, Nicewonder LP I and Burke LP I were the only cash contributors to VFI. Furthermore, in viewing the allegations as a whole, it appears that Nicewonder LP I and Burke LP I were consistently targeted by the Boyds for contributions and investments in the entities which they sought to form. Thus, in essence, not only did Nicewonder LP I and Burke LP I contribute large sums of money to the entities, but they did so under unique circumstances in which the Boyds apparently sought them out to make investments and contributions to their entities. Therefore, I am of the opinion that Nicewonder LP I and Burke LP I suffered injuries that were separate and distinct from other shareholders, thereby establishing standing to pursue a claim under the RICO Act.

CMFL also argues that only VFI has standing as to Counts Twenty-One, Twenty-Two, Twenty-Three and Twenty-Eight. In particular, CMFL contends that only VFI has standing for claims related to the fiduciary duties of the members of the LLC, and it also is arguing that only VFI has standing for claims related to the property of the LLC. Without addressing the merits of the latter argument, the undersigned notes that

Counts Twenty-Three and Twenty-Eight were brought only by VFI, as the counts simply sought relief in favor of VFI. Moreover, as previously discussed, the undersigned recommended that both Counts Twenty-Three and Twenty-Eight be dismissed as to CMFL.

As for Counts Twenty-One and Twenty-Two, which specifically pertain to the alleged conspiracy to breach fiduciary duties owed to VFI, Burke LP I and Nicewonder LP I by Boyd LP I, Luther Boyd, Teresa Colston-Boyd, CWW, CMFL and CMHF, and conspiracy to breach contract with VFI, Burke LP I and Nicewonder LP I by the previously mentioned parties. CMFL argues that, with regard to these claims, under Virginia law, only VFI would possess proper standing. *See generally Remora Invs., L.L.C. v. Orr*, 673 S.E.2d 845 (Va. 2009). As explained in *Remora*, "corporate shareholders cannot bring individual, direct suits against officers or directors for breach of fiduciary duty, but instead shareholders must seek their remedy derivatively on behalf of the corporation." 673 S.E.2d at 848 (citing *Simmons v. Miller*, 544 S.E.2d 666, 675 (Va. 2001)). The plaintiffs contend that CMFL's reliance on *Remora* is misplaced, noting that it involved a situation in which the operating agreement did not establish a fiduciary duty between members and members and/or managers. In fact, the Supreme Court of Virginia specifically observed that the operating agreement in *Remora* "did not establish fiduciary duties between members or between a member and a manager [and stated that if] 'shareholders and the corporation desire to vary commercial rules by contract, they are free do so[]'" and explained that such provisions could be included in a limited liability company's operating agreement. 673 S.E.2d at 848 (citing *Simmons*, 544 S.E.2d at 675.)

In the case at hand, the plaintiffs specifically allege that the operating agreement indicated that the manager owed a fiduciary duty to conduct the company's affairs in a manner that would represent the best interests of the company and its members. (Amended Complaint at 132.) So, here, as opposed to the *Remora* case, the parties to the operating agreement outlined certain fiduciary duties that the managers owed to the company and its members. Thus, under the specific circumstances of this case, both Nicewonder LP I and Burke LP I have standing to pursue these claims because the operating agreement stated that fiduciary duties were owed to the members of the company.

## PROPOSED FINDINGS OF FACT AND
## CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. The Amended Complaint sufficiently pleads a substantive RICO Act violation and a RICO Act conspiracy against CMFL;

2. Counts Six, Eight, Eighteen, Nineteen, Twenty, Twenty-One, Twenty-Two and Twenty-Four sufficiently plead the necessary elements and factual allegations to support plausible claims of statutory conspiracy and common law conspiracy against CMFL under Virginia law;

3. Counts Seventeen, Twenty-Three and Twenty-Eight do not sufficiently plead claims of conversion against CMFL;

4. No relief is sought against CMFL in Counts Nine, Ten, Twelve, Thirteen, Fifteen, Sixteen, Twenty-Five, Twenty-Six, Twenty-

Seven and Twenty-Nine;

5.     Counts Three, Four, Five, Seven, Eight, Nine, Eleven, Fourteen, Twenty, Twenty-One, Twenty-Two and Twenty-Four do not sufficiently plead claims against CMFL because they either contain no substantive allegations against CMFL or contain allegations as to actions of Brian Fuller that were performed as a leased employee from CMFL to Treads;

6.     Because Nicewonder LP I and Burke LP I suffered "separate and distinct" injuries from other shareholders, they have shareholder standing in this RICO Act action; and

7.     Nicewonder LP I and Burke LP I also have standing to pursue the breach of fiduciary duty claims because the operating agreement stated that fiduciary duties were owed to the members of VFI.

## RECOMMENDED DISPOSITION

For the reasons detailed in this Report and Recommendation, I hereby recommend that the court grant CMFL's Motion and dismiss any claim against it contained in Counts Three, Four, Five, Seven, Eight, Nine, Ten, Eleven, Twelve, Thirteen, Fourteen, Fifteen, Sixteen, Seventeen, Twenty-Three, Twenty-Five, Twenty-Six, Twenty-Seven, Twenty-Eight and Twenty-Nine. I further recommend that CMFL's Motion be denied as to Counts One, Two, Six, Eighteen, Nineteen, Twenty, Twenty-One, Twenty-Two and Twenty-Four.

## NOTICE TO PARTIES

Notice is hereby given to the parties of the provisions of 28 U.S.C. §

636(b)(1)(C);

      Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed finding or recommendation to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence to recommit the matter to the magistrate judge with instructions.

      Failure to file written objection to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

      The Clerk is directed to send a certified copy of this Report and Recommendation to all counsel and unrepresented parties of record.

                ENTER:    May 4, 2010.

                /s/ *Pamela Meade Sargent*
                UNITED STATES MAGISTRATE JUDGE